# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

**GABRIEL PEEPLES,**

    **Plaintiff**

**v.**                                         Civil Action No. _____

**CLINICAL & SUPPORT OPTIONS, INC.,**

    **Defendant**

## VERIFIED COMPLAINT

Amidst a national public health disaster, the Centers For Disease Control and Prevention is exhorting employers to "[e]ncourage telework for as many employees as possible" and be "supporting and encouraging [employees'] options to telework" to promote public health and minimize the risk to individual employees."[1]  Nevertheless, Defendant Clinical & Support Options, Inc. ("CSO") is refusing to allow Plaintiff Gabriel Peeples' ("they"/"them"), whose of asthma places them at greater risk associated with COVID-19, to continue teleworking as Peeples has done successfully for three months of the pandemic.

Instead, CSO insists that Peeples return to the office simply because it says it is requiring all managers to return to the office.  CSO is refusing to conduct an individualized assessment of Peeples' situation, in violation of the Americans With Disabilities Act and M.G.L. c. 151B, the Massachusetts Antidiscrimination Law.  Peeples seeks an injunction requiring CSO to allow Peeples to resume teleworking through the duration of the pandemic, as well as compensatory damages for the physical harm and emotional distress Peeples has incurred for working eight-and-a-half weeks in CSO's unsafe office environment while being denied telework.

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/downloads/php/CDC-Activities-Initiatives-for-COVID-19-Response.pdf

## JURISDICTION AND VENUE

1. This suit is brought and jurisdiction lies pursuant to the Americans With Disabilities Act of 1990, 42 U.S.C. §12101 et seq. and M.G.L. c 151B §4.

2. All conditions precedent to jurisdiction under 42 U.S.C. §12117 and 2000e-5(f) are satisfied:

   a. A complaint of discrimination was filed with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission on August 21, 2020, within 300 days of the discriminatory actions alleged in the charge.

   b. A notification of right to sue was received by Gabriel Peeples on September 1, 2020.

   c. This complaint is being filed within 90 days of receipt of the notification of the right to sue notification.

3. This court has supplemental jurisdiction over related state law claims asserted by Plaintiff pursuant to 28 U.S.C. §1367(a).

4. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5(f)(3) insofar as all the discriminatory employment practices alleged in this complaint were committed within the County of Franklin in the Commonwealth of Massachusetts, the plaintiff resides in the County of Hampshire in the Commonwealth of Massachusetts, and the defendant is a corporation with offices in the County of Hampshire in the Commonwealth of Massachusetts.

## PARTIES

5. Plaintiff Gabriel Peeples ("Plaintiff"/"they"/"them") lives at 163 Grove Street, Northampton, MA 01060.

6. Defendant Clinical & Support Options, Inc. ("CSO" or "CSO") is a Massachusetts corporation with a principal place of business at 8 Atwood Street, Suite 301, Northampton, MA 01060, info@csoinc.org.

7. CSO does business in Massachusetts.

8. CSO is a "person" within the meaning of M.G.L. c 151B §1.

9. CSO employs six or more employees and is an "employer" within the meaning of M.G.L. c 151B §1.

10. CSO is engaged in an industry affecting commerce and employs 15 or more employees and is an "employer" within the meaning of 42 U.S.C. §12111(5)(A) of the Americans With Disabilities Act of 1990.

11. Peeples has asthma and is a person with a "disability" as defined by 42 U.S.C. §12102(1) of the Americans With Disabilities Act of 1990.

12. Peeples has asthma and is a person with a "handicap" as defined by M.G.L. c 151B §17.

**Gabriel Peeples' Disability**

13. Peeples was diagnosed with asthma when they were two or three years old.

14. Peeples' asthma impairs their breathing.

15. Peeples primary disability is nonallergic, exercise-induced asthma.  Peeples also has allergic asthma.

16. Peeples' asthma at present is moderate.

17. Peeples' asthma was severe when they were younger.

18. Peeples has received medical treatment for their asthma since Peeples was a young child.

19. Peeples has been prescribed a nebulizer, Proair inhaler (which they regularly use) and medication (which they regularly take) for their asthma.

20. Peeples has seen several specialists to whom they have been referred for their asthma.

21. When they were 19 years old, Peeples suffered a pulmonary embolism, which caused significant trauma to their body.

22. As a result of that embolism, Peeples was hospitalized for five days and then took prescription blood thinners for almost a year afterwards.

23. Peeples sees an allergist and primary care physician for their asthma.

24. Peeples' allergist is Margaret Sharron, N.P., with the Allergy & Immunology Associates of New England in Northampton, Massachusetts. https://www.allergyimmunologydocs.com/  Peeples sees her approximately every six months for supervision of their asthma.

25. Peeples also receives regular treatment from the Atkinson Family Practice, in Northampton Massachusetts.  Dr. Katherine Atkinson supervises Katelyn Dutkiewicz (Physician Assistant-Certified), who is Peeples' principal care provider.

26. Dr. Atkinson and Ms. Dutkiewicz currently prescribe the medication Albuterol for Peeples.

27. Peeples administers the Albuterol through a Proair inhaler whenever they require assistance breathing.

28. Peeples' need for Albuterol varies and depends on factors like environmental conditions and their level of exertion. Peeples administers the Albuterol more in the winter months, sometimes as much as twice a week.  Peeples follows their health care providers' instructions to avoid running as one way to minimize the risks associated with Peeples' asthma. Throughout their life Peeples has had asthma attacks, despite all of their efforts described above to minimize the risks associated with their asthma.

29. These attacks are acute medical episodes where Peeples cannot breathe properly.

30. During the pandemic (roughly since March 15, 2020), Peeples has had three distinct asthma attacks.

31. Several things trigger Peeples' asthma and can spark an attack, including elevated cardio activity especially in colder air or the presence of dust.

32. Having an asthma attack is a terrifying experience.

33. At the onset of an attack, Peeples experiences shortness of breath, wheezing and anxiety. This causes Peeples to feel light-headed and shaky. During an asthma attack, Peeples struggles to fully inhale air.  Peeples' airways feel partially closed and Peeples' lungs start to feel like they are shutting down.

34. When this happens, Peeples immediately grabs their asthma inhaler to administer their medication. This allows Peeples to breathe properly.

**Gabriel Peeples' Qualifications**

35. Peeples received a Master's degree in Social Work, with a concentration in clinical work with children, youth, and families, from Boston College in 2018.

36. Peeples has been practicing as a Licensed Clinical Social Worker since August 2018.

37. For the past 9 years, Peeples has worked in a variety of non-profit settings centered around supporting children, youth, and families.

38. Peeples' professional work in the last decade has included program development and implementation, from youth program development with OUT MetroWest and the Treehouse Foundation, to provider-training development and implementation at Behavioral Health Network ("BHN") and Clinical & Support Options, Inc. ("CSO").

39. At OUT MetroWest, Treehouse, BHN, and CSO, Peeples has facilitated groups and meetings for both youth and colleagues.

40. Peeples has been writing and presenting trainings to providers and community members around issues of marginalization and identities for the past 10 years.

41. Peeples is passionate about working with and in communities to foster support and empowerment for our most vulnerable populations, including individuals of color, immigrants and refugees, LGBTQ+ individuals, and individuals with special needs.

42. At BHN, Peeples worked as the Assistant Coordinator of an initiative called The Empowerment Project for Gender and Sexualities.

43. This work included data management as well as building and maintaining partnerships with community organizations to better serve LGBTQ+ individuals in the greater Springfield area.

44. Peeples received training on trauma-informed care during their tenure at Treehouse and has continued receiving training on promoting regulation and well-being for youth and adults who have experienced trauma.

45. Peeples also received training from Dialogues Across Difference, a program aimed at training individuals to facilitate communication between people with different values and perspectives. Using the Dialogues Across Difference approach, Peeples has been facilitating conversations and trainings around social equity and anti-systemic oppression for the past three years.

46. Peeples enjoys working with people with a variety of backgrounds and values working with people of all ages.

47. Peeples has attended a number of trainings on social and health equity and is passionate about anti-systemic oppression work.

48. As a practitioner, Peeples believes in working with people to help enhance learning and growth.  Peeples uses strength-based, solution-focused, and person-centered methods to find approaches that work best for individuals of all ages, stages, and abilities.

49. Peeples is proficient in the use of electronic case management systems, data entry and management, and online resources.

50. Peeples is experienced in using virtual communication platforms.

51. Peeples developed this proficiency and gained this experience prior to the pandemic, so when the pandemic hit, Peeples was able to make the transition to telework without difficulty.

52. In addition to the essential functions of their job, Peeples assisted some of their colleagues with IT support while teleworking.

**Gabriel Peeples' Employment with CSO**

53. Peeples became employed with CSO on March 2, 2020.

54. Peeples was hired as the Assistant Program Manager at the "Center for Community Resilience after Trauma" ("CCRT"), a program of CSO.

55. The CCRT program is located at 1 Arch Place Greenfield, MA 01301.

56. As the CCRT's Assistant Program Manager, Peeples is tasked with daily management of the program's services, supervision of CCRT staff and providing clinical therapeutic treatment to clients individually and through groups.

57. Peeples' job also requires them to perform data entry tasks and management of other CCRT operations.

**Gabriel Peeples' First Request for Reasonable Accommodation that was Granted**

58. The World Health Organization designated the novel coronavirus outbreak as a global pandemic on March 11, 2020.

59. On March 10, 2020, Massachusetts Governor Charlie Baker declared a state of emergency in the Commonwealth.

60. In mid-March 2020, the news media reported the first several cases of the novel coronavirus in Western Massachusetts.

61. Peeples became very concerned that COVID-19 could threaten their life after learning about the alarming spread and severity of the coronavirus, and its documented presence in the region.

62. The Centers for Disease Control and Prevention (CDC) acknowledges that people with certain underlying conditions, like asthma, are at greater risk of serious illness if they contract COVID-19.

63. Because of Peeples' asthma, their doctors advised them to avoid risk of exposure to the coronavirus and recommended that Peeples should telework.

64. On or around March 18, 2020, Peeples advised their supervisors that Peeples needed to telework to protect their health.

65. On March 20, 2020, Peeples' direct supervisor Kelly Broadway emailed them, at the request of Human Resources, to ask why Peeples was teleworking.

66. Peeples emailed Ms. Broadway in response that "I have an underlying medical condition from the attached list, which is why I am requesting to work from home."

67. Neither Ms. Broadway nor anyone else from CSO requested any further information at that time.

68. Peeples teleworked successfully.

69. Peeples performed all of the essential duties of their position while teleworking, in addition to other tasks that benefited CSO.

70. While teleworking from March 18, 2020 to June 26, 2020, Peeples accomplished the following tasks each week, all via Zoom, over the phone or on email:

   a. Provided therapy to six outpatient clients, plus weekly case consultations and family consults, plus required follow up paperwork;
   b. Provided support to three CCRT clients;
   c. Facilitated two weekly group therapy sessions, along with a weekly preparation session for the groups;
   d. Performed one bi-weekly group and monthly group session;
   e. Participated in CCRT staff meetings;
   f. Attended supervision sessions with their CCRT and clinical supervisors;
   g. Attended an outpatient provider meeting;
   h. Attended weekly trainings (between 2 and 4 on average)
   i. On a daily basis, sent and received dozens of emails, including corresponding regularly with managers, clients, group members, and managed CCRT referrals and requests;
   j. On a daily basis, participated in several phone calls regarding case and collateral consults, referrals and connections to resources;
   k. Edited the CCRT SharePoint page (an online program resource);
   l. Researched opportunities for grant funding;
   m. Planned for Gender-Affirming Grand Rounds (which included writing plans and organizing training materials);

    n.  Assisted with the Cultural Responsiveness Training subcommittee (which they co-chair);

    o.  Performed data entry and data management for grant reporting;

    p.  Regularly communicated with CCRT staff to provide support and guidance, checked in by email, phone and virtual connection platforms.

71. Peeples also occasionally performed other tasks remotely during this time.

72. Peeples was complimented for their performance during teleworking, and received no complaints.

73. On May 14, 2020, Sandi Walters, Associate VP of Community and Family Services (and supervisor of Peeples' supervisor, Ms. Broadway) announced during a manager meeting that CSO wanted managers to return to the office on May 18, 2020.

74. Peeples asked Ms. Walters about possible exceptions for managers who needed accommodations for health conditions, and scheduled a phone call with her.

75. Ms. Walters told Peeples that if they produced a doctor's note to her in the next week or two, that should suffice to allow Peeples to continue teleworking.

76. In an email of May 14, 2020, Ms. Walters said: "If there is an underlying health condition that places the manager at risk then please ask them to seek a note from their doctor and the accommodation or plan that is needed."

77. The next afternoon, Friday, May 15, 2020, Peeples received an email from Ms. Broadway at 4:08PM with an update from Ms. Walters that Peeples would need to submit a doctor's note to Broadway and Walters by mid-morning the next business day (Monday, May 18, 2020) or Peeples would need to use personal time until a doctor's note could be provided.

78. This late-afternoon email also required additional language for the doctor's note, including a prescribed length of time for working from home and specifically naming the underlying condition.

79. Peeples promptly emailed Ms. Walters that Friday afternoon that Peeples had spoken with their doctor that morning and the practice was writing Peeples a note, but Peeples had just seen the updated requirements about specific language and their doctor's practice was now closed for the weekend. Peeples asked Ms. Walters to clarify the language requirements and also asked about flexibility regarding timing of the note, considering that most doctors' practices have a 48-hour turn-around time for such notes.

80. Two days later, on Sunday, May 17, 2020, Peeples received a response from Ms. Walters that the language requirements were suggestions, not mandates. Nevertheless, she also told Peeples that Peeples would need to take time off and use personal time or sick time if Peeples could not provide an updated doctor's note the next day, on Monday, May 18, 2020.

81. On Monday, May 18, 2020, Peeples sent a note from their primary care physician Dr. Atkinson to their supervisors Ms. Walters and Ms. Broadway, stating that Peeples "should continue to work from home for the next four weeks or until a clear safety protocol is established in their workplace." Exhibit 1.

82. The next day, Tuesday, May 19, 2020, Ms. Walters emailed Peeples that Human Resources had reviewed Peeples' note and "Since Safety Protocols will be in place by week end in the CCRT space,  during Phase 1 we are asking you to work part time in the office each week."

83. Ms. Walters' email did not explain what "Safety Protocols" meant.

84. When Dr. Atkinson's practice learned that CSO was interpreting "Safety protocols" to mean "return this week and not the 4 weeks specified" – i.e., no "Safety Protocols" at all—Dr. Atkinson provided Peeples with a revised note dated May 19, 2020 repeating Peeples' need to telework but removing the reference to safety protocols.  Exhibit 2.

85. Peeples forwarded this May 19 note to Ms. Walters and Ms. Broadway in which Dr. Atkinson said that Peeples "should continue to work from home for the next four weeks, at which time, reassessment will happen."

86. Ms. Walters submitted this May 19 note to Human Resources.

87. On or around May 20, 2020, Ms. Broadway emailed Peeples a note from Ms. Walters that Peeples' request for a reasonable accommodation was allowed, their primary care provider's May 19 note was accepted, and Peeples was approved to telework for the next four weeks.

88. During those four weeks, Peeples continued doing all of the duties described above plus additional tasks to support their colleagues, all via telework.

89. During those four weeks of teleworking, Peeples continued to perform all of the essential functions of their job well.

90. No one at CSO complained to Peeples about any aspect of Peeples' job performance during this time.

**CSO Denies Gabriel Peeples' Request for Continued Reasonable Accommodation**

91. As that four-week period was about to expire, on June 15, 2020, Peeples asked CSO to continue the accommodation of allowing them to telework.

92. Peeples emailed an updated doctor's note to Ms. Walters and Ms. Broadway explaining that Peeples had followed up with Dr. Atkinson who advised them to continue telework as a medical necessity. Exhibit 3.

93. On June 19, 2020 Ms. Broadway emailed Peeples that CSO was denying Peeples' request to continue teleworking as a reasonable accommodation. Exhibit 4.

94. In her email, Ms. Broadway quoted Ms. Walters stating the sole reason for CSO's denial: "The why behind the mandate is that they are not approving work from home for managers since we need managers in the building and supporting operations.  Staff who have FMLA expected to do the same." Exhibit 4.

95. Nothing in Ms. Broadway's email, or in any other communication Peeples ever received from CSO, included any individualized assessment by CSO of whether Peeples could perform the essential functions of their job via telework, or whether that accommodation somehow would impose an undue burden on CSO.

96. CSO already knew that Peeples could perform the essential functions of their job via telework, because Peeples had been successfully doing so for three months, since March 18, 2020, and Peeples' teleworking had not created any undue burden for CSO.

97. On June 22, 2020, Peeples emailed Ms. Walters after learning that CSO was mandating that all managers return to the office at the start of Massachusetts's "Phase 3."

98. In that email, Peeples expressed their concerns, based on their asthma, about the dangers of their returning to the office.

99. Peeples asked Ms. Walters to clarify the duties they would be expected to perform in the office that they were not already performing via telework.

100.     When Ms. Walters and Peeples spoke on the phone the next day, June 23, 2020, Peeples expressed serious concerns about their health if CSO forced them to return to the office.

101.     Peeples reminded Ms. Walters that Peeples' medical providers and all of the guidance Peeples had read advised Peeples to continue teleworking to avoid increased risk of exposure to COVID-19 because of their asthma.

102.     Ms. Walters confirmed that Peeples' duties in the office would be the same as those duties they had been performing satisfactorily while teleworking the previous three months.

103.     Peeples asked Ms. Walters if they could still do their outpatient hours from home so that Peeples did not have to wear a mask while working with clients, mostly young children.

104.     Peeples also asked Ms. Walters to clarify what CSO meant by "start of Phase 3," because according to CSO that meant June 29, 2020 but according to  the Massachusetts government that meant July 6, 2020 or perhaps later.

105.     On June 23, 2020, Ms. Walters emailed Peeples to reiterate that CSO was denying Peeples' request to continue to telework as a reasonable accommodation. Exhibit 5.

106.     In her email, Ms. Walters said only that all supervisors were to return June 29, 2020, working full-time, with no extensions; again she made no reference to any individualized assessment by CSO of Peeples' situation.

107.     CSO was refusing to allow Peeples to continue to do any work via telework, even outpatient hours. Exhibit 5.

108.     CSO instructed Peeples to come back to the office and offered them an N95 mask.

109.     CSO said that Peeples would be required to take accrued time off when Peeples could not work in the office and called that requirement an "accommodation."

110.     On or around June 23, 2020, Peeples spoke with Ms. Broadway on the phone and via text about what Peeples would need to try to mitigate Peeples' risks in returning to the office.

111.     Peeples requested CSO to provide certain essential safety precautions such as personal protective equipment ("PPE"), hand sanitizer at their desk, wipes to sanitize their space, and an air purifier.

112.     Peeples also requested their physical work materials and the yoga ball they used for a desk chair be moved to an isolated and private workspace.

113.      Ms. Broadway submitted Peeples' requests and said that things would be in place for Peeples' return.

114.      CSO's denial of Peeples' request to continue to telework made no sense.

115.      Peeples had already successfully teleworked for three months.  Nothing about Peeples' job responsibilities was going to change.

116.      Every task Peeples would be performing from the office would be done virtually. While sitting in their office, Peeples would continue to participate in zoom and phone calls and exchange emails and texts from colleagues and clients.  Outpatient therapy and staff meetings would continue to be virtual.

117.      CSO offered no explanation why Peeples could not continue to telework, other than it was now requiring all managers to be physically present in the office.

118.      CSO's refusal to allow Peeples to continue teleworking devastated Peeples.

119.      CSO was requiring Peeples to return to the office despite the fact that Peeples was able to perform their essential job functions remotely.

120.      While Peeples loves their job, the work they do and the people they do it with and for, Peeples was frightened to return to the office because Peeples' health care providers were telling them that their asthma placed Peeples at greater risk of serious illness from COVID-19.

121.      From June 29, 2020 through July 3, 2020, Peeples used all of the time off they had accrued (including sick, personal, and holiday)—as CSO required—to take the week off so that Peeples could emotionally and physically prepare to return to the office.

**Gabriel Peeples' Return to the Office and Negative Impact on Their Health and the Services Provided to Therapy Clients**

122.      On July 6, 2020, Peeples reluctantly returned to working full time in the CCRT office.

123.      CSO did not set up Peeples' workspace as Peeples had requested, except to provide an air purifier.

124.      CSO failed to provide PPE, masks, hand sanitizer and wipes.

125.      CSO had not moved Peeples' work materials and yoga ball.

126.     Peeples collected hand sanitizer from the supply closet, used wipes from the kitchen to clean their space, and collected their work materials and yoga ball from the office that Peeples had previously shared with Ms. Broadway.

127.     On July 7, 2020, CSO provided Peeples with four KN95 masks, not N95 masks as promised.  Peeples' understanding is that N95 masks are held to a higher standard than KN95 masks, making it easier to breathe than the KN95 masks.

128.     Working in the office has caused Peeples significant hardship and emotional distress.

129.     Peeples wears a mask at all times while in CSO's office.

130.     Peeples cannot eat or drink in the building since that would require removing their mask.

131.     Peeples keeps all of their food and water in their car and eats lunch in their car, which has been uncomfortable during the heat waves throughout the past two months.

132.     The building Peeples works in is old and poorly ventilated. Their workspace is open and connected to the main room traversed by other people on Peeples' floor.

133.     Peeples often walks past individuals who are not wearing masks when Peeples enters or exits the building.

134.     Even those who are wearing masks near Peeples' workspace are not wearing them properly, because the masks are hanging off of or not fully covering the face.

135.     CSO employees (sometimes improperly masked, or not masked at all) have barged into Peeples' reconfigured workspace without knocking while Peeples is working, sometimes while Peeples is on confidential calls with clients.  These occurrences mean that, despite Peeples' best efforts, Peeples cannot avoid interactions with other people in the office.

136.     Sharing indoor airspace with people outside of your household who are not using a mask, or not using a mask properly, heightens the risk of transmission of COVID-19. This makes Peeples vigilant in using their mask while in the building.

137.     Peeples' clients, colleagues, and members of the groups that they facilitate have had a hard time hearing Peeples while Peeples is wearing a mask, which often leads to Peeples shouting and repeating themself to be heard and understood.

138.     Peeples sees five outpatient clients and five CCRT clients between the ages of 7 and 59.  Four of the five outpatient clients are under the age of 12.

139.     Covering a large portion of Peeples' face makes it harder for Peeples to mirror and reflect emotions with their clients, most of whom are children.  This impairs Peeples' ability to provide the quality of care necessary for the emotional regulation work that Peeples does with those clients.

140.     On August 6, CCRT staff (including Peeples) received headsets to use for zoom calls and meetings. The headset reduces the need for shouting, but a mask still hinders clients and staff from picking up on the visual cues from Peeples' face and mouth, requiring Peeples frequently to repeat what Peeples has said.

141.     Since Peeples can only drink water when they go out to their car to change masks, Peeples is often dehydrated and hoarse with a sore throat when they leave at the end of the day from all of the talking Peeples does without water.

142.     Peeples has lost about 10 pounds since July 6, 2020 while working in the office as a result of the stress and their inability to eat throughout the day.

143.     Peeples had an asthma attack in July 2020 that was triggered by rushing into the office to report for work.

144.     Peeples is physically and emotionally drained by the end of each workday.  When Peeples gets home, they shower and change, prepare their work materials for the next day and then go to bed.

**Peeples' Supervisor Supports Peeples' Third Request to Resume Telework, But CSO Denies It**

145.     On July 27, 2020, Peeples emailed an additional Reasonable Accommodation Request to their supervisor Ms. Broadway. Their request was supported by a letter from Peeples' allergist Margaret Sharron, who requested that CSO reasonably accommodate their asthma by allowing them to resume teleworking. Exhibit 6.

146.     The next day, Ms. Broadway forwarded Peeples' Reasonable Accommodation Request to Human Resources.

147.     Ms. Broadway supported Peeples' request in a letter of her own, explaining "there is [sic] currently no tasks assigned to Gabriel that they cannot do from home. I am fully able to manage all details and tasks that require being on site." Exhibit 7.

148.     Ms. Broadway explained the challenges that Peeples has had to deal with due to
the precautions they were taking to work from the office: "As Gabriel's direct supervisor,
I would much prefer for their own sense of safety and wellbeing, as well as for the quality
of their work, for them to be able to operate from a location where they feel safe." Id.

149.     On July 29, 2020, Ms. Walters responded to Ms. Broadway that CSO still was
denying Peeples' request for the accommodation to telework. Exhibit 8.

150.     Ms. Walters scheduled a time to talk with Ms. Broadway and Peeples to explain
this and discuss ways CSO could make Peeples feel safe. Exhibit 9.

151.     The next day, July 30, 2020, Peeples met via zoom with Ms. Walters and Ms.
Broadway.

152.     In that meeting, Ms. Walters told Peeples that CSO was denying their
accommodation request simply because it expects all managers to work from the office.

153.     Peeples responded that they had encountered more than 10 people (CSO staff,
community members, postal workers, and delivery people) in the building who were not
wearing masks in the past four weeks while Peeples had been working in the office.
Peeples explained that as a result of the reconfiguration of the office due to the pandemic,
their workspace was no longer confidential (there are spaces in the wall behind Peeples
that open into the main space of the floor). Peeples explained that multiple people had
walked into Peeples' office without knocking while Peeples was on confidential calls.

154.     Peeples also explained that the stress of being in the office while at higher risk,
being dehydrated, and being difficult for other people to hear, all were negatively
affecting Peeples' job performance.

155.     Peeples said in that meeting, and Peeples still believes, that CSO had no
legitimate reason to deny their accommodation request.

156.     CSO denied Peeples' request because it was requiring all managers to work from
the office. Exhibit 8.

157.     CSO did not conduct any individualized assessment of Peeples' circumstances
(i.e., the relationship between their asthma and their increased risk associated with
COVID-19).

158.     CSO did not say that Peeples' continued teleworking created any kind of undue
burden on the organization.  Nor could CSO say that, because Peeples had teleworked

successfully for three months, and nothing about Peeples' job responsibilities was changing.

159.    Peeples noted that the message Peeples was getting was that CSO does not care about Peeples' health, safety, or whether Peeples would survive the pandemic.

160.    Ms. Walters suggested a space (the North Suite) that might be more confidential for work, and that she would ask if Peeples could use that space. She said she would follow up with facilities about people not wearing masks in the building.

161.    On August 5, 2020, Ms. Broadway texted Peeples that she followed up with Ms. Walters about the North Suite and that it was not available as a workspace because it does not have direct bathroom access. Ms. Broadway offered a different space on Peeples' floor for an office space, but that space has all of the problems of Peeples' current space.

162.    Peeples spoke with Ms. Broadway and let her know that the office conditions imposed by CSO are harming Peeples and impede their ability to perform their job duties.

163.    Peeples told Ms. Broadway that under all of these circumstances, CSO is forcing them to resign.

164.    Ms. Broadway asked Peeples' permission to reach out to Ms. Walters to explain the situation. She did so.

165.    In response, Ms. Walters instructed Ms. Broadway to write an email explaining the reason for Peeples' resignation.

166.    Peeples believes that Ms. Broadway did so.

167.    Peeples believes that Ms. Walters sent Ms. Broadway's email to CSO's CEO Karin Jeffers and to Human Resources.

168.    On August 10, 2020, Peeples emailed an offer of resignation to Ms. Broadway, effective September 5, 2020.

169.    After consulting with Ms. Walters, Ms. Broadway suggested that Peeples add a stipulation about being willing to rescind their resignation if CSO allows them to telework.

170.    Since teleworking was what Peeples had been asking for, Peeples submitted a revised offer of resignation consistent with Ms. Broadway's suggestion.  Exhibit 10.

171.    In that offer of resignation, Peeples wrote:

Dear Kelly,

It greatly saddens me to send you this letter of resignation. Effective September 5, 2020, I will no longer be working at CCRT as the Assistant Program Manager. As we have discussed, I have asthma, which substantially increases my risk associated with the COVID-19 pandemic. After consulting with my medical providers, I submitted multiple reasonable accommodation requests to work remotely for my safety and wellbeing. CSO's eventual denial of these requests, after initially granting the accommodation for 4 months, has put my health and safety at risk. The increased stress of working in the office against medical advice and CSO's failure to maintain a safe environment creates an additional burden on my security and productivity. Because of these reasons, I feel I have no choice but to resign.

I have very much enjoyed my time working at CCRT. The work gave me great satisfaction, and I appreciate the opportunity to work with the amazing staff that makes up CCRT and the Greenfield office. Please let me know if there are any ways that I can help with my transition out of this position. I appreciate all of your help and support during this already challenging time. I would welcome the refusal of this resignation if working from home is made available to managers and staff for our safety and health. Exhibit 10.

172.　　　Ms. Broadway forwarded this revised offer of resignation to Human Resources.

173.　　　CSO neither accepted nor responded in any fashion to Peeples' offer of resignation.

## CSO Announces That Managers May Propose To Work Remotely, But Continues to Deny Peeples' Request To Do So

174.　　　On Thursday, August 27, 2020 at approximately 9:30am, Ms. Walters told managers (including Peeples) in a phone call that managers with children could submit proposals to work remotely for up to two days a week.

175.　　　Immediately following that call, Ms. Walters called Peeples to apologize for incorrectly saying during the preceding call that Peeples' last day was August 28 (it was not) and for referring to Peeples by incorrect pronouns.

176.　　　During that follow-up call, Peeples confirmed Ms. Walters' statement that CSO would be allowing some managers to telework.

177.　　　Ms. Walters responded that it was unlikely that CSO would allow Peeples to telework.

178.　　　Also on August 27, 2020, Peeples' supervisor Kelly Broadway emailed her supervisor Ms. Walters:

Would you be willing to share this with KP [Senior Vice President of Programs Karen Poisson] & KJ [CEO Karin Jeffers], please? And of course add to it/edit if something feels not helpful.

Thank you.

 Reasons to accommodate Gabriel Peeples work from home request:

·      They will be licensed by the end of this year as LICSW and can supervise the other CCRT clinicians.

·      They are bilingual English/Spanish

·      They are trained in TF-CBT which is great for working with people with trauma (all the ppl CCRT serves)

·      They are currently being trained in an new evidenced-based therapy for kids, PSB-CBT (problematic sexual behavior) through a learning collaborative with our CAC.

o  Half of the reports (totalling 86) that both FC & HC CAC's got last year were for child-on-child problematic sexual behavior. All 3 CCRT clinicians are getting trained and they will be the only clinicians in this service area who are trained in this EBP. Once they complete their training, they can then become trainers for agency (if needed).

o  Gabriel is an excellent facilitator & trainer. They are thoughtful, intuitive, always prepared, and very tech savvy.

·      They identify as Gender non-binary and this is crucial for creating safety and trust when serving Gender Queer clients. Hate-motivated crime is rising for LGBTQ folks.

·      They are extremely knowledgeable about LGBTQ resources in our service area.

·      They have exceeded productivity since they began their outpatient hours

·      They have agreed to serve as the Chair for the training workgroup within the Cultural Responsive Committee.

·      They are co-facilitating Gender-Affirming Grand Rounds with Jen Malcolm-Brown and, in addition to being a skilled facilitator, their knowledge in this area about trends, language, resources, skills/tools in supporting LGBTQ folks, and LGBTQ rights has already proven to be quite helpful to the staff that attend this grand rounds.

·      They have set up pivot tables in excel to more easily capture trends within CCRT services related to crime/victimization, demographics, services provided, and number of quarters served. This also allows me to report data for grant apps more quickly.

· CCRT has a really solid staff team right now; the diversity in our skill sets, interest areas within our work, and knowledge is very complementary. We know each other's strengths and learning curves and support each other in our learning and growing. I do not want to see this disrupted as it impacts the effectiveness of our work as a team.

· I'd like really like to be able to do my job of working with and for victims of crime, strengthening collaborative relationships with other providers, and exceeding funding service requirements rather than spending more time on-boarding & training.

· There is currently no part of their assigned work for CCRT & outpatient that they could do more effectively from home where they feel safe, they don't have to wear a mask, or eat lunch in their car.

Gabriel is immensely valuable to CCRT and CSO. We do not want to lose them. Please. Exhibit 11.

179.     Based on Ms. Walters' statement of August 27 that CSO would be allowing some managers to telework, and on Ms. Broadway's repeated expression of her support for Peeples' request, on August 28, 2020, Peeples emailed their supervisor Ms. Broadway to renew their request to resume teleworking and to rescind their previous offer of resignation:

Dear Kelly,

I am writing to rescind my August 10, 2020 (3:55pm) email in which I expressed that I felt compelled to resign, effective September 5, 2020, because CSO had denied my request to continue teleworking.

As you know, I love my work and have enjoyed my time at CCRT. In fact, in my August 10 email I wrote that "I would welcome the refusal of this resignation if working from home is made available to managers and staff for our safety and health." I have learned recently that CSO is now providing some managers with the opportunity to telework. This seems to me to be a change in the "all-managers-must-work-in-the-office" policy that CSO said it had adopted a few months ago. Given that, I am writing to renew my request that I be permitted to continue teleworking as I had for three months. Recently, I've had to tell clients that my situation here is uncertain. That is not good for my clients, for CCRT, or for CSO.

I can and want to continue to serve my clients and to work with my colleagues. But my continuing to come into the office against medical advice is harming me, and is not sustainable. In the interest of being a good team player, I will, if necessary, come into the office next week. I would hope that CSO will promptly grant my request to

telework so that I don't have to come into the office next week. Otherwise, as of Tuesday, September 8, I will stop coming into the office and will resume meeting with clients and participating in office meetings remotely via zoom or phone.

Exhibit 12.

180.     On Tuesday, September 1, 2020, Ms. Walters called Peeples to say that CSO was denying Peeples' renewed request to resume teleworking.

181.     In this phone call, Ms. Walters at one point said that CSO was not allowing managers to work remotely.

182.     This statement conflicted with Ms. Walters' statement in the August 27 phone call with managers.

183.     When Peeples pressed Ms. Walters on this contradiction, Ms. Walters responded simply said that CSO would not allow Peeples to work remotely.

184.     In telling Peeples that CSO would not allow Peeples to work remotely, Ms. Walters again made no reference to any individualized assessment that CSO had done of Peeples' situation and of the connection between Peeples' asthma and the related increased risk of serious illness associated with COVID-19.

185.     On this same day, Tuesday, September 1, 2020, Peeples' clinical supervisor Jen Malcolm-Brown was working remotely.

186.     Shortly after the September 1, 2020 phone call, Peeples emailed Ms. Walters:

Dear Sandi,

Thank you for calling me today at around 9:35am to tell me that CSO is denying my most recent request (August 28, 2020 at 3:56pm) to return to telework for my health and safety.  You said that CSO is not allowing managers to work from home.  This was contrary to what you said in the August 27 phone call with managers.  When I pressed you on this in our call this morning, you responded that CSO would not allow **me** to do so.   (In fact, today my clinical supervisor, Jen Malcolm-Brown, is working from home.)  You then asked if I still plan to rescind my resignation.

As I said in my August 28 email, I've rescinded my resignation and intend to keep working—this week in the office (despite the continued risk to my health), and via telework starting September 8. I will proceed as I said in my August 28 email.  Thank you.

Sincerely,
Gabriel (they/them)

Exhibit 13.

187.     Losing this job will create additional hardship for Peeples, including loss of future wages and benefits, and will harm those clients who rely on Peeples for weekly therapy sessions.

188.     Through counsel, CSO has reiterated that it does not approve of Peeples' teleworking on September 8, and that if Peeples tries to do so, "CSO will enforce its applicable policies," implying termination.

## COUNT ONE: DISCRIMINATION BASED ON DISABILITY
### (42 U.S.C. §12112)

189.     The allegations of paragraphs 1-187 are incorporated herein by reference.

190.     Defendant's acts and omissions constitute unlawful discrimination against Peeples on the basis of their disability, in violation of the Americans With Disabilities Act, 42 U.S.C. §12112.

191.     Defendant's failure and refusal to provide Peeples with a reasonable accommodation that would enable Peeples to remain employed constitutes illegal discrimination against Peeples on the basis of their disability in violation of the Americans With Disabilities Act, 42 U.S.C. §12112.

192.     Defendant's acts and omissions created a hostile work environment on the basis of disability, and failed to eliminate that hostile work environment, in violation of the Americans With Disabilities Act, 42 U.S.C. §1211.

193.     Defendant's discriminatory acts and omissions have caused, continue to cause and will cause Peeples substantial damages for lost past and future wages, the loss of employment benefits and other pecuniary losses, as well as mental anguish and humiliation, emotional distress, the loss of enjoyment of life and other nonpecuniary losses.

## COUNT TWO: DISCRIMINATION BASED ON DISABILITY
### (M.G.L. c 151b, §4(16))

194.     The allegations of paragraphs 1-192 are incorporated herein by reference.

195.     Plaintiff Peeples is a qualified handicapped person within the meaning of M.G.L. c 152, §75B(1) and M.G.L. c 151B, §4(16).

196.     Defendant's acts and omissions constitute unlawful discrimination against Peeples on the basis of their disability, in violation of M.G.L. c 151b, §4(16).

197.     Defendant's failure and refusal to provide Peeples with a reasonable accommodation that would enable Peeples to remain employed constitutes illegal discrimination against Peeples on the basis of their disability in violation of the Americans With Disabilities Act, 42 U.S.C. §12112.197.

198.     Defendant's acts and omissions created a hostile work environment on the basis of disability, and failed to eliminate that hostile work environment, in violation of the Americans With Disabilities Act, 42 U.S.C. §1211198.

199.     Defendant's discriminatory acts and omissions have caused, continue to cause and will cause Peeples substantial damages for lost past and future wages, the loss of employment benefits and other pecuniary losses, as well as mental anguish and humiliation, emotional distress, the loss of enjoyment of life and other nonpecuniary losses.

## PRAYER FOR RELIEF

Plaintiff Gabriel Peeples requests judgment as follows:

1. A temporary restraining order and preliminary injunction requiring Defendant to permit Plaintiff to telework for the duration of the pandemic and otherwise requiring Defendant to discontinue its discriminatory practices.

2. Declaratory relief that Defendant's rejection of Plaintiff's request for the accommodation of telework violates the Americans With Disabilities Act and the Massachusetts Anti-discrimination Law under M.G.L. c. 151B.

3. Compensatory damages in an amount to be determined at trial, plus statutory interest on any such award.

4. Punitive damages in an amount to be determined at trial.

5. Reasonable attorneys' fees, together with litigation expenses and costs of suit.

6. Such other relief as the Court deems appropriate.

## **DEMAND FOR JURY**

Plaintiff Gabriel Peeples hereby demands a trial by jury on all jury-triable issues.

PLAINTIFF GABRIEL PEEPLES
By their attorneys,

Douglas E. Mishkin
BBO #569423
Heisler, Feldman & McCormick, P.C.
293 Bridge Street, Suite 322
Springfield, MA 01103
dmishkin@hfmgpc.com
Cell 202-361-8793

Christa Douaihy
BBO #569069
Heisler, Feldman & McCormick, P.C.
293 Bridge Street, Suite 322
Springfield, MA 01103
cdouaihy@hfmgpc.com
Cell 917.208.5829
(Application forthcoming)

Date:  September 2, 2020

<u>VERIFICATION</u>

I, Gabriel Peeples, have read the complaint and that the allegations contained therein are true to the best of my knowledge. Signed under the pains and penalties of perjury on this 2nd day of September 2020.

GABRIEL PEEPLES