UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

**GABRIEL PEEPLES,**

     **Plaintiff**

**v.**                                   Civil Action No. _____

**CLINICAL & SUPPORT OPTIONS, INC.,**

     **Defendant**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

This pandemic has taken many victims of different kinds.  Absent an injunction, Defendant Clinical & Support Options, Inc. ("CSO"), a community mental health organization,[1] unnecessarily will create more victims, thereby harming Plaintiff Gabriel Peeples ("Plaintiff"/"they"/"them"), Peeples' therapy clients and the public.

Peeples' asthma subjects them to increased risk of severe illness associated with COVID-19.  For the first three months of the pandemic, CSO allowed Peeples to telework, thereby avoiding that increased risk.  Now CSO has ordered Peeples to return to the office, against the express written recommendation of Peeples' supervisor, Kelly Broadway, and the advice of Peeples' health care providers, simply because CSO now wants managers to work in the office.

CSO's refusal to allow Peeples to continue teleworking flies in the face of the exhortation of the Centers for Disease Control and Prevention ("CDC") that employers should "[e]ncourage telework for as many employees as possible" and be "supporting and

---

[1] www.csoinc.org

1

encouraging [employees'] options to telework. *Infra* at n. 8.  In so doing, CSO is violating its obligation under the Americans With Disabilities Act and the Massachusetts Anti-Discrimination Law to do an individualized assessment of Peeples' circumstances, specifically:

- Does Peeples have a disability? Yes.

- Does that disability place Peeples at greater risk associated with COVID-19? Yes.

- Can Peeples do the essential functions of their job with an accommodation that avoids that risk? Yes—telework.

- Would the accommodation of allowing Peeples to continue to telework impose an undue burden on CSO? No--that accommodation succeeded for three months.

Absent an injunction, Peeples cannot continue to work for CSO.  Presumably CSO will fire Peeples for refusing to come to the office and put their health at greater risk.  When that happens, Peeples will join the ranks of the unemployed and potentially of the homeless, a result the public interest screams to avoid.  And the clients for whom Peeples provides weekly mental health therapy will lose their therapist, another unnecessary insult to the public interest.

**FACTS**

1. **Asthma is associated with greater risks of COVID-19.**

According to the American College of Allergy, Asthma & Immunology, there are two types of asthma: allergic and nonallergic.[2]  Allergic asthma is triggered by exposure to an allergen such as mold or pet dander. Nonallergic asthma is brought on by factors such as stress, exercise, extreme weather, irritants in the air and certain medications.  Peeples has both

---

[2] https://acaai.org/asthma/asthma-101

allergic and nonallergic asthma, but their primary asthma is nonallergic.  *Verified Complaint* (hereafter "Comp.") ¶15.  Peeples' asthma is moderate. *Id.* ¶16.

The CDC says: "People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19.  COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."[3]

The emerging medical literature supports the conclusion that persons, like Gabriel Peeples, who have nonallergic asthma actually are at increased risk for severe illness from COVID-19.  That conclusion is reported in a Letter to the Editor entitled "Association of asthma and its genetic predisposition with the risk of severe COVID-19," published June 6, 2020 in the Journal of Allergy and Clinical Immunology.[4] Ex. 14.[5] In the Letter, by six Harvard medical scientists, the authors begin by noting: "The Centers for Disease Control and Prevention currently list asthma as a risk factor for severe illness from coronavirus disease 2019 (COVID-19).  This is a logical determination because the non-COVID-19 literature indicates that patients with asthma have increased susceptibility to viral respiratory infection." The authors then observed that "no studies have specifically examined the relationship of asthma…with incident COVID-19.  To address the major knowledge gap, we examined the relationship of asthma and its major phenotypes [i.e., observable characteristics] with the risk of developing severe COVID-19."  After describing the patient population data that they studied, the authors concluded that "…adults with asthma had a higher risk of severe COVID-

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html
[4] https://www.jacionline.org/article/S0091-6749(20)30806-X/abstract
[5] All exhibits cited herein are exhibits to the Complaint.

19, which was driven by the increased risk in patients with nonallergic asthma."  Ex. 14 at 329.

In addition to the heightened risk associated with nonallergic asthma, people with asthma of either kind are at greater risk of a longer period of intubation associated with COVID-19.  In "Asthma prolongs intubation in COVID-19," published in the Journal of Allergy and Clinical Immunology: In Practice in July-August 2020,[6] the authors reported that "[a]sthma was independently associated with prolonged duration of intubation for coronavirus disease 2019." Ex. 15.  The authors explained that "…among the patients who developed severe respiratory symptoms requiring intubation, asthma was associated with a significantly longer intubation time." *Id.*  The authors concluded that "our study in a large cohort of patients indicate preexisting asthma as a predictor of intubation duration in COVID-19, especially in patients younger than 65 years."  *Id.*

The two pieces quoted above show that asthma of either kind subjects a COVID-19 patient to a greater risk of longer intubation, and that nonallergic asthma in particular subjects a person to greater risk of severe illness from COVID-19.   Peeples has both kinds of asthma and is subject to both categories of greater risk.

To protect employees like Peeples who are at higher risk, the CDC says[7]:

> As workplaces consider a gradual scale up of activities towards pre-COVID 19 operating practices, it is particularly important to keep in mind that some workers are at higher risk for severe illness from COVID 19.  These workers include individuals…with underlying medical conditions.  Such underlying conditions include…moderate to severe asthma….

At 46.

---

[6] https://pubmed.ncbi.nlm.nih.gov/32417445/
[7] https://www.cdc.gov/coronavirus/2019-ncov/downloads/php/CDC-Activities-Initiatives-for-COVID-19-Response.pdf

To address those risks, the CDC recommends: "Encourage telework for as many employees as possible," and "supporting and encouraging [employees'] options to telework."

2. **Peeples needs to continue to telework to minimize COVID-19-related risks.**

    A. **Peeples teleworked successfully from March 18 to May 18.**

Peeples is employed as the Assistant Program Manager at the "Center for Community Resilience after Trauma" ("CCRT"), a program of CSO. *Comp.* ¶54.  The CCRT program is located at 1 Arch Place, Greenfield, Massachusetts. *Comp.* ¶55.  In that role, Peeples is tasked with managing the program's services, supervising CCRT staff and providing clinical therapeutic treatment to patients individually and in groups. *Comp.* ¶56.  Peeples also performs data entry tasks and manages other CCRT operations. *Comp.* ¶57.

As COVID-19 cases increased in Western Massachusetts, Peeples learned that their asthma puts them at higher risk for catastrophic illness if they contract COVID-19. *Comp.* ¶¶61-63.  Guidance from every level of government directs members of the public -- especially those with certain medical conditions like asthma -- to socially distance, avoid close contact with others and practice vigilant sanitization.[8]

On March 18, 2020, Peeples asked CSO to accommodate their asthma by permitting them to telework. *Id.* ¶64.  CSO said yes.  For the next two months Peeples teleworked successfully. *Comp.* ¶¶65-72.  Specifically, Peeples:

    a. Provided therapy to six outpatient clients, plus weekly case consultations and family consults, plus required follow up paperwork;
    b. Provided support to three CCRT clients;
    c. Facilitated two weekly group therapy sessions, along with a weekly preparation session for the groups;
    d. Performed one bi-weekly group and monthly group session;
    e. Participated in CCRT staff meetings;

---

[8] https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/going-out.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fdaily-life-coping%2Factivities.html

    f.   Attended supervision sessions with my CCRT and clinical supervisors;

    g.  Attended an outpatient provider meeting;

    h.  Attended weekly trainings (between 2 and 4 on average)

    i.   On a daily basis, sent and received dozens of emails, including corresponding regularly with managers, clients, group members, and managed CCRT referrals and requests;

    j.   On a daily basis, participated in several phone calls regarding case and collateral consults, referrals and connections to resources;

    k.  Edited the CCRT SharePoint page (an online program resource);

    l.   Researched opportunities for grant funding;

    m. Planned for Gender-Affirming Grand Rounds (which included writing plans and organizing training materials);

    n.  Assisted with the Cultural Responsiveness Training subcommittee (which I co-chair);

    o.  Performed data entry and data management for grant reporting;

    p.  Regularly communicated with CCRT staff to provide support and guidance, checked in by email, phone and virtual connection platforms.

Peeples also occasionally performed other tasks remotely during this time.  *Comp.*

¶71.  Peeples was complimented for their performance, with no complaints.  *Comp.* ¶72.

### B.  Peeples continued to telework successfully from May 18 to June 15.

On May 14, 2020, CSO announced that it now wanted managers to work in the office starting May 18th, 2020. *Comp.* ¶73. On recommendation of their physicians, Peeples asked to continue teleworking as a necessary accommodation. *Comp.* ¶¶74-86. CSO said yes again, and Peeples continued teleworking successfully, through June 15, 2020.  *Comp.* ¶¶87-90.

### C.  CSO then denied Peeples' request to continue to telework.

On June 15, 2020, Peeples told CSO of their need to continue teleworking. *See Comp.* at ¶¶ 91,92.  This time, CSO said no, and told Peeples to return to the office starting June 29, 2020. *Comp.* ¶¶93-106.

Why did CSO say no?  Not because Peeples could not perform the job via telework—Peeples had done so successfully for three months.  Not because Peeples' telework created an undue burden for CSO—it had not. *Comp.* ¶90. Not because the quality of Peeples' telework was unacceptable—CSO had praised their performance during this unprecedented time.

*Comp.* ¶72, 90. Not because Peeples' job responsibilities were about to change—they were not. And not because Peeples' direct supervisor, Kelly Broadway, opposes the request—to the contrary, Ms. Broadway has repeatedly and emphatically endorsed it. *Comp.* ¶¶147, 148, 178.

Most important, CSO did not say no because it conducted an individualized assessment of Peeples' circumstances, as the law requires. CSO did not examine the relationship between Peeples' asthma and their increased risk associated with COVID-19. Had CSO done so, presumably one of the three physicians on its staff[9] could have explained that Peeples' asthma puts Peeples at increased risk of severe COVID-19.

CSO did none of those things. Instead, it simply decided that it wants all managers in the office, without regard for Peeples' individualized continuing need to telework. *Comp.* ¶¶73,94,97,117. CSO's Sandi Walters admitted this in an email: "The why behind the mandate [to work in the office] is that they [management] are not approving work from home for managers since we need managers in the building and supporting operations." *Comp.* ¶94; Ex. 4.

> **D. Peeples is working from the office less productively while harming their own health and impairing their ability to serve their therapy clients.**

Given no alternative, Peeples reluctantly returned to working in the office on July 6, 2020. *Comp.* ¶122. But this made no sense. Every task Peeples performed from the office was virtual. While sitting in their office, Peeples continued to do work that they had done via telework outside the office for three months: participating in zoom and phone calls and

---

[9]https://www.csoinc.org/vision-and-leadership.John Swanson, M.D., Medical Director; Matthew Friedman, M.D., Associate Medical Director; Alex Altamarino, M.D., Associate Medical Director, Addiction Services. Pre-discovery, Peeples does not know for a fact, and thus can only infer, that CSO has not consulted its own physicians in refusing to permit Peeples to telework despite the recommendation of Peeples' health care providers.

exchanging emails and texts with colleagues and patients. *Comp.* ¶¶115,116.   Outpatient

therapy and staff meetings continued to be virtual. *Comp.* ¶ 116.

When CSO denied Peeples' request to continue teleworking, it assured Peeples it

would provide hand sanitizer, wipes, a private office space and an N95 mask. *Comp.*

¶¶111,112. But on Peeples' first day back in the office, CSO failed to deliver as promised.

*Comp.* ¶¶123-127.

Working in the office, Peeples must wear a respiratory face mask continuously

throughout the day. *Comp.* ¶¶129-136. Although their primary responsibilities are interacting

with people virtually, Peeples regularly encounters people inside the office, from staff to

delivery people, who are unmasked or without sufficient face covering. *Id.* The office is

poorly ventilated. *Comp.* ¶132.  This means respiratory droplets (the primary method of

coronavirus transmission) can linger for longer.[10] Consequently, even while masked, Peeples

remains exposed to the risk of COVID-19. *Comp.* ¶¶132-136.

Peeples will not remove their mask at work because of the ambient risk of exposure to

COVID-19 and the high risk of severe illness if exposed. *Id.* The mask substantially impairs

Peeples' ability to help their clients in remote therapy sessions, because behind a mask

Peeples cannot mirror emotions with clients or project empathy needed for emotional

regulation—the bread and butter of what licensed clinical social workers like Peeples must

do. *Comp.* ¶¶137-140.

Working from the office also harms Peeples physically.  Masked continuously,

Peeples goes long stretches of time without drinking water or eating. *Comp.* ¶¶130, 131, 140,

141. Peeples has lost approximately 10 pounds since returning to onsite work. *Comp.* ¶142.

They suffer from daily stress and exhaustion. *Comp.* ¶144.  Perhaps most alarming, Peeples

had an asthma attack in July 2020 that was triggered by rushing into the office to report for

work. *Comp.* ¶143.

**E.   CSO again denied Peeples' request to resume teleworking.**

On July 27, 2020, after enduring weeks of these grueling conditions at the office,

Peeples submitted another Reasonable Accommodation Request to resume teleworking.

*Comp.* ¶145. Peeples supported that request with a letter from their allergist Margaret

Sharron, who reaffirmed that Peeples' asthma necessitated the telework accommodation. *Id.*

Peeples' supervisor, Ms. Broadway, also supported this request, explaining "there is [sic]

currently no tasks assigned to Gabriel that they cannot do from home.  I am fully able to

manage all details and tasks that require being on site." *Comp.* ¶147

Nevertheless, on July 29, 2020, CSO denied that request and mandated that Peeples

remain in the office full time.  *Comp.* ¶¶ 149, 156.

Forced to "choose" between their health and their job, Peeples resigned effective

September 5, 2020. *Id.* ¶¶168-171:

> Dear Kelly,
>
> It greatly saddens me to send you this letter of resignation. Effective
> September 5, 2020, I will no longer be working at CCRT as the Assistant
> Program Manager. As we have discussed, I have asthma, which substantially
> increases my risk associated with the COVID-19 pandemic. After consulting
> with my medical providers, I submitted multiple reasonable accommodation
> requests to work remotely for my safety and wellbeing. CSO's eventual denial
> of these requests, after initially granting the accommodation for 4 months, has
> put my health and safety at risk. The increased stress of working in the office
> against medical advice and CSO's failure to maintain a safe environment
> creates an additional burden on my security and productivity. Because of these
> reasons, I feel I have no choice but to resign.
>
> I have very much enjoyed my time working at CCRT. The work gave me great
> satisfaction, and I appreciate the opportunity to work with the amazing staff
> that makes up CCRT and the Greenfield office. Please let me know if there are
> any ways that I can help with my transition out of this position. I appreciate all

---

[10] https://www.nytimes.com/2020/07/09/health/virus-aerosols-who.html

of your help and support during this already challenging time. I would welcome the refusal of this resignation if working from home is made available to managers and staff for our safety and health.

**Ex. 10.**

After Peeples submitted this revised offer of resignation, CSO's Sandi Walters told

Peeples that CSO had begun to offer telework as an accommodation to some managers.

*Comp.* ¶174.  In addition, Peeples' supervisor Ms. Broadway weighed in again with full-

throated support for Peeples to resume teleworking, in an email to Ms. Walters.  Ms.

Broadway's remarkable email warrants quotation in full:

> Would you be willing to share this with KP [Senior Vice President of Programs Karen Poisson] & KJ [CEO Karin Jeffers], please? And of course add to it/edit if something feels not helpful.
>
> Thank you.
>
> Reasons to accommodate Gabriel Peeples work from home request:
>
> · They will be licensed by the end of this year as LICSW and can supervise the other CCRT clinicians.
>
> · They are bilingual English/Spanish
>
> · They are trained in TF-CBT which is great for working with people with trauma (all the ppl CCRT serves)
>
> · They are currently being trained in an new evidenced-based therapy for kids, PSB-CBT (problematic sexual behavior) through a learning collaborative with our CAC.
>
> o Half of the reports (totalling 86) that both FC & HC CAC's got last year were for child-on-child problematic sexual behavior. All 3 CCRT clinicians are getting trained and they will be the only clinicians in this service area who are trained in this EBP. Once they complete their training, they can then become trainers for agency (if needed).
>
> o Gabriel is an excellent facilitator & trainer. They are thoughtful, intuitive, always prepared, and very tech savvy.
>
> · They identify as Gender non-binary and this is crucial for creating safety and trust when serving Gender Queer clients. Hate-motivated crime is rising for LGBTQ folks.
>
> · They are extremely knowledgeable about LGBTQ resources in our service area.

·      They have exceeded productivity since they began their outpatient hours

·      They have agreed to serve as the Chair for the training workgroup within the Cultural Responsive Committee.

·      They are co-facilitating Gender-Affirming Grand Rounds with Jen Malcolm-Brown and, in addition to being a skilled facilitator, their knowledge in this area about trends, language, resources, skills/tools in supporting LGBTQ folks, and LGBTQ rights has already proven to be quite helpful to the staff that attend this grand rounds.

·      They have set up pivot tables in excel to more easily capture trends within CCRT services related to crime/victimization, demographics, services provided, and number of quarters served. This also allows me to report data for grant apps more quickly.

·      CCRT has a really solid staff team right now; the diversity in our skill sets, interest areas within our work, and knowledge is very complementary. We know each other's strengths and learning curves and support each other in our learning and growing. I do not want to see this disrupted as it impacts the effectiveness of our work as a team.

·      I'd like really like to be able to do my job of working with and for victims of crime, strengthening collaborative relationships with other providers, and exceeding funding service requirements rather than spending more time on-boarding & training.

·      There is currently no part of their assigned work for CCRT & outpatient that they could do more effectively from home where they feel safe, they don't have to wear a mask, or eat lunch in their car.

Gabriel is immensely valuable to CCRT and CSO. We do not want to lose them. Please. *Comp.* ¶178.

**Ex. 11.**

> **F. Peeples renewed their request to resume teleworking after learning CSO is now permitting some managers to telework.**

Based upon CSO's apparent change in policy to allow some managers to telework, and Ms. Broadway's repeated endorsement of Peeples' request, Peeples emailed Ms. Broadway on August 28, 2020 repeating their request to telework and rescinding their previous offer of resignation (which CSO had not accepted):

Dear Kelly,

I am writing to rescind my August 10, 2020 (3:55pm) email in which I expressed

that I felt compelled to resign, effective September 5, 2020, because CSO had denied my request to continue teleworking.

As you know, I love my work and have enjoyed my time at CCRT. In fact, in my August 10 email I wrote that "I would welcome the refusal of this resignation if working from home is made available to managers and staff for our safety and health." I have learned recently that CSO is now providing some managers with the opportunity to telework. This seems to me to be a change in the "all-managers-must-work-in-the-office" policy that CSO said it had adopted a few months ago. Given that, I am writing to renew my request that I be permitted to continue teleworking as I had for three months. Recently, I've had to tell clients that my situation here is uncertain. That is not good for my clients, for CCRT, or for CSO.

I can and want to continue to serve my clients and to work with my colleagues. But my continuing to come into the office against medical advice is harming me, and is not sustainable. In the interest of being a good team player, I will, if necessary, come into the office next week. I would hope that CSO will promptly grant my request to telework so that I don't have to come into the office next week. Otherwise, as of Tuesday, September 8, I will stop coming into the office and will resume meeting with clients and participating in office meetings remotely via zoom or phone.

**Ex. 12.**

### G. CSO denied Peeples' latest request to renew teleworking.

On Tuesday, September 1, CSO's Sandi Walters called Peeples to say that CSO was denying Peeples' August 28 request to resume teleworking. *Comp.* ¶181. In this call, Ms. Walters said at one point that CSO was not allowing managers to work remotely. *Comp.* ¶182. This statement conflicted with Ms. Walters' statement to the managers in the phone call of August 27. *Comp.* ¶183. When Peeples pressed Ms. Walters on this contradiction, Ms. Walters responded simply that CSO would not allow Peeples to work remotely. *Comp.* ¶184. In telling Peeples that CSO would not allow Peeples to work remotely, Ms. Walters again made no reference to any individualized assessment that CSO had done of Peeples' situation and of the connection between Peeples' asthma and the related increased risk of serious illness associated with COVID-19. *Comp.* ¶185.

Shortly after the September 1, 2020 phone call, Peeples emailed Ms. Walters:

Dear Sandi,

Thank you for calling me today at around 9:35am to tell me that CSO is denying my most recent request (August 28, 2020 at 3:56pm) to return to telework for my health and safety.  You said that CSO is not allowing managers to work from home.  This was contrary to what you said in the August 27 phone call with managers.  When I pressed you on this in our call this morning, you responded that CSO would not allow **me** to do so.   (In fact, today my clinical supervisor, Jen Malcolm-Brown, is working from home.)  You then asked if I still plan to rescind my resignation.

As I said in my August 28 email, I've rescinded my resignation and intend to keep working—this week in the office (despite the continued risk to my health), and via telework starting September 8. I will proceed as I said in my August 28 email.  Thank you.

Sincerely,
Gabriel (they/them)

**Ex. 13.**

This request for a temporary restraining order follows.

**ARGUMENT**

## I.  PEEPLES IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### A.  Complainant satisfies the criteria for a temporary restraining order.

The Court may issue a temporary restraining order or preliminary injunction after considering: "the movant's likelihood of success on the merits"; "whether and to what extent the movant will suffer irreparable harm" in the absence of injunctive relief; "the balance of [relative] hardships," that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues; and "the effect, if any, that an injunction [or the lack of one] may have on the public interest." *See*, *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013).

The First Circuit has found that "the heart of this test is the second and third steps, which present the question whether the harm caused to plaintiff without the injunction, in

light of the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendant." *Vargas-Figueroa v. Saldana,* 826 F.2d 160,162 (1st Cir. 1987) (citing *Massachusetts v. Watt,* 716 F.2d 946, 953 (1st Cir. 1983); *SEC v. World Radio Mission,* 544 F.2d 535, 541 (1st Cir. 1976)). While likelihood of success is critical in this analysis, the Court "need not predict the eventual outcome on the merits with absolute assurance." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 16 (1st Cir. 1996). Rather, it need only find that there is a "strong likelihood" that the Plaintiff will eventually prevail. *Sindicato Puertorriqueño de Trajabadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012). Peeples meets their burden on each factor.

**1. Peeples will suffer irreparable harm absent a temporary restraining order or an injunction.**

Absent a TRO, presumably CSO will fire Peeples for refusing to continue working in the office—an unsustainable scenario for Peeples that threatens their health. Through counsel, CSO has reiterated that it does not approve of Peeples' teleworking on September 8, and that if Peeples tries to do so, "CSO will enforce its applicable policies," implying termination. Termination will mean the loss of Peeples' health care coverage during a pandemic that places Peeples' at increased risk because of Peeples' disability.  It will create the spectre of long-term unemployment during a pandemic that has swelled the unemployment rolls.[11] Unemployed, Peeples will become housing unstable and possibly homeless, which further

---

[11] The unemployment rate in Massachusetts soared to 14.5% in July 2020 – one of the highest rates in the country. See, U.S. Department of Labor report, available at:
https://www.scribd.com/document/470996648/Unemployment-Insurance-Weekly-Claims

increases their risk of COVID-19.[12] All of this is in addition to the emotional injury and reputational damage Peeples will incur.

**2. Peeples' irreparable harm absent an injunction far outweighs the nonexistent harm to CSO from granting the injunction.**

CSO suffered no harm while Peeples teleworked successfully for three months. Allowing Peeples to continue teleworking will not harm CSO.  CSO's Ms. Broadway, who supervises Peeples, supports their request.

CSO's position is that Peeples—despite their asthma and associated COVID-19 risks—must come to the office because CSO wants all managers in the office. As CSO's Sandi Walters wrote: "I don't think work at home will be approved because it is not being approved for managers."  Ex. 8.  That blanket policy violates CSO's obligation to do an individualized assessment.  It has nothing to do with avoiding harm to CSO.  There has been, and will be, no harm to CSO from Peeples continuing to telework.  *See, Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 616-617 (1980).

Furthermore, it is stunning that CSO, a provider of mental health services, would be so brazen in its disregard for the health of one of its own providers.  Were one of CSO's mental health clients being subjected to similar treatment by an employer, surely CSO would go to bat for that client and demand the very individualized assessment that CSO is denying Peeples.

---

[12] Noting the correlation between housing instability and negative health outcomes, leading health officials believe evictions exacerbate the COVID-19 public health emergency. See, https://www.opportunityhome.org/wp-content/uploads/2020/08/Health-Housing-OSAH-Letter-FINAL-8.6.pdf

**3.  Peeples is likely to prevail on the merits.**

Peeples likely will prevail on their claims that CSO violated their rights under the Americans with Disabilities Act and M.G.L. c. 151B by unjustly refusing their request for the reasonable accommodation of continuing to telework.

To prevail on such a claim under the ADA, Peeples must establish that they (1) suffered from a disability as defined by the ADA; (2) was otherwise qualified to perform the essential functions of their employment with or without reasonable accommodation; and (3) was subject to an adverse employment action, **such as an unreasonable refusal to make an accommodation of their disability**. *Carroll v. Xerox Corp.,* 294 F.3d 231, 237 (1st Cir.2002) (emphasis added).  Peeples satisfies each element.

a.  **Peeples' asthma is a "disability" under the ADA.**

Peeples has asthma, which was categorized as severe when Complainant was younger and is currently deemed "moderate."  *Comp.* ¶¶16,17. Complainant's asthma is a qualifying disability because it is a medical condition that substantially limits one of their major life activities, i.e., breathing. 42 U.S.C. §12102(1); *Comp.* ¶¶13-34.

Peeples' asthma entitles them to request a reasonable accommodation. That Peeples' accommodation request stems from the advent of COVID-19 is consistent with the protections of the ADA.  A federal district court recently ruled that a proper disability determination logically must consider an employee's serious underlying conditions "in light of the pandemic's existence."  *Silver v. City of Alexandria, et al.,* 2020 WL 3639696, (W.D. La 2020) (July 6, 2020).[13] Thus, Complainant's asthma is a qualifying disability that entitles them to a reasonable accommodation.

---

[13]The Court granted Plaintiff, a disabled city council member, a preliminary injunction allowing him to appear for meetings by phone during the pandemic: "Neither the ADA…contain[s] any language to limit application to

### b. Peeples is qualified to perform the essential functions of their job with the requested reasonable accommodation.

For three months Peeples performed the essential functions of their job (and more) via telework. Peeples' immediate supervisor, Ms. Broadway, has repeatedly and strongly supported this request. Better evidence of Peeples' qualification to perform the job and the reasonableness of the requested accommodation is hard to imagine.

### c. CSO's refusal to allow Peeples to continue to telework is unreasonable.

Continuing to allow Peeples to telework would not unduly burden CSO. Furthermore, what CSO proposed as an "accommodation" was nothing of the kind. Even had CSO delivered on its promised hand wipes, sanitizer, a face mask and a separate work space in the office, these items would not have addressed the risk to Peeples of regularly confronting unmasked people in Peeples' private office space and common areas of the agency. These items also would not ameliorate the physical and emotional strain of wearing a face mask all day long or the impediments to Peeples' job performance. In the office, Peeples simply cannot avoid the elements that place them, with their asthma, at increased risk.

### d. CSO failed to engage in an interactive dialogue.

The EEOC regulations state that: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3).

---

certain environmental or health-related situations. It makes complete sense to say that any application of these laws to these facts must be based upon a factual analysis that considers the totality of Mr. Silver's health circumstances in conjunction with one's social circumstances. Call it a totality of the circumstances evaluation. The determination of a qualifying disability in this case cannot be looked at in a vacuum…[G]enerally, the pandemic is the unprovided-for case. In sum, consideration of Mr. Silver's documented serious underlying

The interactive process "requires a great deal of communication between the employee and employer." *García-Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 648 n.12 (1ˢᵗ Cir. 2000), citing *Criado v. IBM Corp.,* 145 F.3d 437, 444 (1st Cir.1998). Once the employer knows of the disability and the employee's desire for accommodations, the employer has the burden to request additional information that the employer believes it needs in order to fashion a reasonable response. *Taylor v. Phoenixville School District,* 184 F.3d 296, 315. (3ʳᵈ Cir. 1999). Both parties then have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith. *Id.* at 312. It requires bilateral cooperation and communication. *See Enica v. Principi,* 544 F.3d 328, 339 (1st Cir.2008).  Both the employer and the employee must engage in good faith.  Empty gestures by the employer are not good faith.  *See E.E.O.C. v. Kohl's Dep't Store Inc.* 774 F.3d 127, 131 (1ˢᵗ Cir. 2014).

CSO fell far short of meeting its interactive-process obligation. Simply deciding unilaterally that "I don't think work at home will be approved because it is not being approved for managers" (Ex. 8) violated CSO's duty to engage in an interactive process.[14] Mechanically applying that policy to Peeples without regard to Peeples' asthma and its associated COVID-19 risks further violated that duty. Engaging in such a process in good faith would have required CSO to understand the basics of the relationship between asthma and COVID-19, as reported in the two attached medical journal pieces.  Exs. 14,15.  Had CSO done so, it would have understood its obligation to allow Peeples to continue to telework,

---

medical situation, in light of the pandemic's existence, is the proper way to make the disability determination here. It is not the reverse, as the defense suggests." *Silver*, *supra*, at 4.

[14] "The possibility of working at home…should be considered in evaluating whether an employer can reasonably accommodate an individual's need to be away from the workplace. If a qualified individual can perform the essential functions of his/her position from an off-site location without posing an undue hardship on the employer, such accommodation may be reasonable. Such a determination depends on the nature of the job, the individual and the handicap." MCAD Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B, § X.B (1998). These guidelines represent the MCAD's interpretation of G.L. c. 151B, and are entitled to substantial deference, even though they do not carry the force of law. *Dahill v. Police Dept. of Boston,* 434 Mass. 233, 239, (2001).

rather than simply ask "Do you think we will lose them?"  Ex. 8. *See, e.g., Smith v. Bell Atlantic*, 63 Mass. App. Ct. 702 (2005), (Allowing a disabled employee to work from home would be a reasonable accommodation under G.L. c. 151B.)

For these reasons, Complainant is likely to prevail on their claims for unlawful discrimination under the Americans with Disabilities Act and G.L. c. 151B.

### 4.  The public interest will be served, not be adversely affected, by an injunction.

An injunction will protect Peeples, a person with asthma, from unnecessary exposure to COVID-19 related risks; preserve their employment, thereby avoiding adding to the bloated unemployment rolls; preserve Peeples' income, thereby avoiding adding to the ranks of the housing unstable; and keep Peeples out of the public sphere and in a safe private place suitable for telework.

This injunction also will serve those clients who receive weekly therapy from Peeples. Interrupting those services, particularly during this pandemic that creates additional burdens on those already struggling with mental health issues, runs counter to the sensible and compassionate administration of public health.

All of those benefits of the injunction serve the public interest, not harm it. The CDC[15] and the EEOC—the agencies charged with protecting the public's health and employment— already expressly encourage employers to seek out opportunities for all employees to telework rather than commute to a physical workspace.  Peeples' asthma makes telework an imperative.

This injunction will promote the public interest by protecting Peeples' health and employment during the pandemic.

**CONCLUSION**

For the foregoing reasons, Plaintiff Gabriel Peeples requests that this Court issue injunctive relief requested in this motion and order Defendant Clinical & Support Options, Inc., to grant Peeples' request to continue to perform their job through telework, and not be required to work in Defendant's physical office during the pandemic, pending further order of the Court.

Dated: September 3, 2020                    THE PLAINTIFF

By their attorneys,

_____
Douglas B. Mishkin
BBO # 569423
Heisler, Feldman & McCormick, P.C.
293 Bridge Street, Suite 322
Springfield, MA  01103
Cell (202) 361-8793
dmishkin@hfmgpc.com

_____
Christa Douaihy
(Application forthcoming)
BBO # 569069
Heisler, Feldman, & McCormick, P.C.
293 Bridge Street, Suite 322
Springfield, MA 01103
Cell (917) 208-5829
cdouaihy@hfmgpc.com

---

[15] https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html